## COMPENSATION CLAIMED FOR VOLUNTARY CARE OF A DECEASED RELATIVE.

Common Pleas Court of Hamilton County.

HONORAH REGAN, EXECUTRIX UNDER THE LAST WILL AND TESTAMENT OF CATHERINE McNULTY, DECEASED, v.
JOHN J. CAIN.

Decided, March, 1919.

*Aged Relative Provided with a Home and Care—No Agreement, Express or Implied, as to Compensation—Possession·Given by the Invalid of Her Securities—Which are Claimed After Her Death as Compensation.*

1. A valid gift *inter vivos* requires delivery to the donee, and relinquishment of dominion over the property by the donor; where the evidence shows that after the delivery of such property as an alleged gift to the donee, the donor continued to exercise dominion and control over the same, and the donee recognized it as belonging to the donor, the evidence disproves a gift.
2. In the absence of an express contract to pay for the same, a claim for services rendered by one member of a family to another member thereof can not be sustained.
3. In an action for an accounting only those items can be allowed which are supported by proper evidence. No speculation can be indulged as to the state of the accounts.

*C. C. McGary* and *Dickerson, Black & Dickerson,* for plaintiff.
*L. F. Ratterman,* contra.

DARBY, J.

The petition alleges that the plaintiff is the executrix of the estate of Catherine McNulty, deceased; that deceased died January 11, 1917, in Pennsylvania, and that prior to her decease she delivered to the defendant a certificate for six shares of stock of the Cincinnati Gas & Electric Company and two unregistered bonds, for the sum of $500 each, issued by the Toledo, Bowling Green & Southern Traction Company, upon which bonds interest coupons were attached in the amount of

$300; that the delivery of the stock and bonds to the defendant was made to collect the interest on said bonds as they matured and the dividends payable on stock, and that defendant agreed to account for same to decedent and hold the same for her as her agent; that this delivery was made by reason of the age and infirmities of the decedent; that during the life of decedent the stock was sold for a sum unknown to the plaintiff; that defendant claimed to have expended a certain amount of the proceeds of same for said decedent; that the said bonds were in the possession of the defendant at the time of the death of the decedent, but the defendant has refused to deliver the same to plaintiff and has also refused to account for the proceeds of the sale of the stock. The prayer of the petition is that the defendant be required to account for the proceeds of the stock and bonds and coupons and for a judgment against him for any sum found to be due with interest.

An amended answer was filed during the trial, which consists of two defenses: (1) a general denial; and (2) substantially as follows:

That prior to 1906, the decedent boarded and lived with the father and mother of the defendant for about twenty-five years; that she was unmarried and a sister of defendant's mother, and during said period was furnished a home, without consideration, and that during the last six years of the time the defendant had aided his father and mother in the maintenance of the home; that defendant's mother died in 1906; that he was married in June of 1906, and that thereafter, in 1907, the deceased returned to his home and lived there for a period not stated; that at no time while residing with the defendant did the deceased pay or give any consideration to the defendant or his wife for board and home furnished her; that from July, 1907, to April, 1911, decedent lived at various places away from the defendant, but during said period frequently visited the home of the defendant; that in April, 1916, decedent was ill, living with a woman, stranger to her, and the defendant, learning of this, caused her transfer to a hospital, where she was ill for two weeks; that while his said aunt was at said hospital defendant and his wife visited her and she expressed a wish to return

to the home of defendant, "promising that if this defendant
would again take her into his home she would turn over to him
everything that she had;" that during subsequent visits the
decedent repeated her request to return to his home and to live
with defendant and his wife, and "this defendant finally did
consent to permit her to come and live with him and his wife
at their home, and thereupon before leaving the hospital she
turned over to this defendant the key to her safe deposit box
and gave to this defendant all that was contained in same;"
that thereupon the said decedent went to the home of the de-
fendant to live and the defendant secured from her safe deposit
box the certificate for the stock referred to and also the two
bonds with the coupons attached; that shortly thereafter the
defendant had decedent endorse said certificate of stock and he
sold the same and his said aunt endorsed the check to him; that
thereafter the decedent continued to live at his home and re-
quired various sums of money, which defendant furnished to
her, but kept intact the two bonds referred to "because his said
aunt had been a great burden to him and his wife and he de-
sired to have this fund with which to pay an entrance fee for
her into some home if the care and burden of keeping her be-
came too great for himself and wife;" that in the fall of 1916,
decedent expressed a wish to visit her sister (the plaintiff in
this case) at Scranton, Pennsylvania, and left Cincinnati to
visit her, this defendant furnishing her with money needed for
the trip, and that while she was at Scranton he sent money to
the decedent, and after her death there, in January, 1917, he
paid all funeral expenses. The last paragraph of the answer
is as follows:

"That if the same were not to be regarded as compensation
for taking his said aunt into his home, the amount involved
would be insufficient to compensate him for what he and his
family have done for his said aunt, and what was done for his
said aunt was not done with a view of only doing what his said
aunt could afford to pay for."

And defendant prays that plaintiff's petition be dismissed.

On the trial of the case the plaintiff called the defendant as
a witness for the purpose of cross-examination, under favor of

the section permitting cross-examination of the adverse party, and plaintiff. expressly waived the 'privilege of the statute rendering the defendant incompetent because the plaintiff was executor, etc.

It may be said that the only evidence in the case which bore upon the dealings of the defendant with the decedent consisted of his own testimony and that of his wife. Defendant's testimony was in substance as follows:

That when the decedent became ill and was taken to the hospital he visited her there and she made the proposition to him that she would turn over to him all that she had if he would take her into his home. This proposition was under consideration by the defendant and his wife for some days, when he finally accepted it, and the decedent turned over to him, through his wife, the safety deposit box key, and shortly thereafter the decedent was taken to the home of the defendant. The defendant further stated that he took the stock from her safety deposit box and placed it in his own, and that it was sold some time in June, 1916, the amount realized from the same being $450. The defendant stated that about the time the stock was sold decedent asked him to sell it; that he thereupon got the stock from his deposit box, took it to her, and she endorsed it (evidently in blank). He thereupon took it and sold it and received a check payable to her order. She then endorsed the check (evidently in blank), defendant cashed it and took the money back to her, and she thereupon handed it back to him and told him that it was for his birthday and to pay for a Ford machine, which he had recently bought, and she stated at the time that if she had more she would buy a self-starter.

It is admitted that the defendant paid her bill at the hospital; that from the time she went to his home until October, a period of about six months, he advanved other moneys to her, which will be more particularly referred to and are all mentioned in a letter written by him to the plaintiff, which is in evidence. The defendant testified that in addition thereto, he advanced her small sums of money from time to time as she would need them, to go to the city, shopping, etc., and he stated that he had no account of these small amounts, but that in his

opinion they would amount to from $75 to $100, and upon being pressed to give his best estimate of the amount he fixed it at $100.

The defendant admitted writing a letter to the plaintiff, whom, it should be remembered, was also his aunt and a sister of the decedent, dated December 11, 1916. It is a long letter and some extracts will be made from the same which seem to be important.

On page 2 of the letter, the defendant states to the plaintiff that—

"Aunt Kate (decedent) is entirely irresponsible in regard to money matters. I suppose you have noticed that by this time. She does not seem to realize the fact that she can not have all the money she wants and everything she wants."

This letter contains a number of statements by defendant as to the property of the decedent, which are as follows:

"Now the fact of the matter is that all Aunt Kate has is a bond in the Toledo, Bowling Green & Southern Traction Company which calls for $1,000 when it matures, which will be in about four years. If it were sold today all it would bring would be about $800. Now I do not want to touch this bond, as it is all she has and she will probably need it. I am doing the best I can to keep her in funds without touching this bond. The bond pays five per cent., or $50 a year. That is her entire income as far as her money is concerned.

"If she continues to demand money at the rate she has been asking for it, I will have to sell her bond and give her what she wants. If I do this her income of $50 a year will be gone and she will have what she wants as long as it will last. Then she will have to depend on others for her support. I think I have been generous to her and have kept my word to her to look after her as I have been so kindly reminded of in her letter, and I think she has received enough to make her feel independent.

"Now the time is coming when it may be necessary to make some other provisions for Aunt Kate. She will in all likelihood have to enter a hospital or a home, as she is suffering from hardening of the arteries. Aunt Kate was never told of this, as the doctor and sisters said it was best for her not to know it. You know what that leads to. She wanted to enter a home here before she made up her mind to visit you. Now it will take a $1,000 to do that. In a place where she can be independent and come and go as she likes. She can not expect to

stay on with you and she can not seem to be content here. Now if 1 continue to furnish her money at the rate she has been getting it, where will all this come from? Dr. Hoppe of the Good Samaritan Hospital examined her. He is about the best nerve specialist in the country. He says there is nothing the matter with her back; that it is entirely a mental condition caused by the hardening of her arteries, and that as the disease progresses she will become more feeble and will have to have constant attention. The only place she can get this is in a hospital. So I am going to try to keep what she has left together so that she can be properly taken care of when that time comes.''

There was a reference made in the testimony to a will made by the decedent in Scranton, after she went there in October, but the will was not offered in evidence nor its contents in any way proved. But there was testimony that the decedent had no property whatsoever except the stock and bonds referred to, and it is fair to be presumed that she made or attempted to make some disposition of one or the other of these in her will.

Defendant offered in evidence a letter written to him January 27, 1917 (bearing date, by mistake, of the year 1916), by his aunt, the plaintiff in this case, in which, among other things, she states that in a conversation with the decedent that the latter stated: ''I know he will take care of what is mine.''

The defendant further testified that during the period of the residence of the decedent at his home, from the spring of 1916 until October of that year, she was constantly ill and required a great deal of care, which he and his wife administered to her, and that the condition of his aunt was such as to require care similar to that given to a child.

In the letter of December 11, 1916, from the defendant to the plaintiff, he enumerates a number of sums of money which he had expended for the decedent before she left his home, which aggregated $109.80, and in that letter says:

''That makes $109.80 she has received from me since she came home from the hospital. Now don't you think that is a lot of money for her to spend? As she has had absolutely no expense to pay of any kind. I bought her medicines, paid for her dentist bill and tried my best to get her what she wanted.''

The testimony was that at Christmas time, 1916, the defendant sent decedent $25, and that after her death he paid her funeral expenses, aggregating $234.75. There were other small items enumerated, such as a dentist bill of $3, a lawyer, $5, masses at Scranton, $25, telegrams. $7.50. The total of all these items, which are not in dispute, being $410.05.

The defendant further testified that the sale of the bond was made on or about March 3, 1917, and with the accrued interest thereon netted him $714.17.

The testimony of Mrs. Cain, wife of the defendant, was directed principally to her visits to the hospital, during which decedent stated she would turn over to defendant all she had if he would take her home and take care of her, and that she was required to massage decedent, help her bathe and dress morning and evening; that it was hard to humor or please her; that a great deal of extra work was required of her, and that decedent was quite exacting; that it was on her first visit to the hospital to see decedent that decedent handed her her money, jewelry and keys to the safety deposit box, which the witness later gave to the defendant; that nothing was said about boarding the decedent, but that the board and services rendered to her were reasonably worth $15 per week.

This was, in substance, the testimony in the case, excepting that the plaintiff offered in evidence the original answer of the defendant, which agrees with the amended answer, excepting that the original answer contains a paragraph eliminated from the amended answer, as follows:

"This defendant gave the attention and care to his said aunt for the sake of his mother, with whom his said aunt lived as aforesaid for twenty-five years or more, and his aunt made the gift to him as aforesaid not to compensate him in any way for what he and his wife had done prior to the gift or might do thereafter, but solely as a token of appreciation, knowing that this defendant and his family had always taken excellent care of her and always would continue to do the same."

Briefly stated, the plaintiff claims that a trust was created in the defendant, for the benefit of the decedent, and that his dealings and decedent's dealings with the stock and bonds indicate

this; while, on the other hand, the defendant claims, in the first place, that it was a gift, and, in the second place, if it was not a gift, that he is entitled to compensation for services rendered to the decedent.

In the discussion of this case it must be constantly kept in mind that the plaintiff relied almost exclusively, to prove her case, upon the testimony of the defendant, and the position is taken by the plaintiff that though the defendant now claims that he is entitled to the property either as a gift or as compensation for services rendered, that his actions relative to the property are inconsistent with either claim and consist rather with the claim of the plaintiff that he held the stock and bonds for the decedent and that he is now accountable to her executrix.

Does the evidence support the claim that a gift of the stock and bonds was made by the decedent in her lifetime to the defendant?

. "A gift *inter vivos* has been defined as an immediate, voluntary and gratuitous transfer of his personal property, by one to another. It is essential to its validity that the transfer be executed, for the reason that there being no consideration therefor, no action will lie to enforce it. A gift *inter vivos* has no reference to the future, but goes into immediate and absolute effect. To render the gift complete, there must be an actual delivery of the chattel, so far as the subject is capable of such a delivery, and without such a delivery the title does not pass." *Flanders* v. *Blandy,* 45 Ohio St., 108, 113.

"Whether a gift is *inter vivos or causa mortis,* or made through the medium of a trust, it is none the less a gift and subject to the conditions which the law places upon gifts; and whether the gift is made to a third person as agent for the donor or as trustee for the donee, there must be such a distinct and absolute delivery of the property as to show a relinquishment of all dominion over the property by the donor. 14 A. & E. Ency Law (2 Ed.), 1025, 1026. 'To constitute a valid gift the transfer must be consummated, and not remain incomplete, or rest in mere intention; and this is so whether the gift is by delivery only, or by the creation of a trust in a third person by the donor; enough must be done to pass the title.' *Martin* v. *Funk et al,* 75 N. Y., 134. 'The acts must be of that character which will admit of no other interpretation than that such legal rights as the settlor retains are held by him as trustee for the donee; the settlor must either transfer his property to a trustee

or declare that he holds it himself in trust. An intention to give, evidenced by a writing may be most satisfactorily established and yet the intended gift may fail because no delivery is proved. And where an intention to give absolutely is evidenced by a writing which fails because of its non-delivery, the court will not and can not give effect to an intended absolute gift by construing it to be a declaration of trust and valid, therefore, without delivery.' " And cases cited. *Worthington* v. *Redkey,* 86 Ohio St., 128, 134.

There seems to be no room for discussion that a valid gift *inter vivos* must not only be delivered to the donee or some one for him, but that the donor must relinquish any dominion over the gift.

The defendant, in seeming contradiction of his claim that the bonds and stock were given and delivered to him by decedent before her removal from the hospital, testified that after her return to his home he took the stock from the safety deposit box at the request of his aunt and took it to her for endorsement. She seems not to have endorsed it to him, but rather in blank. He then went out and negotiated a sale of the stock and got the check for the proceeds in her name, which he took and delivered to decedent. She endorsed this check again in blank, and when he cashed it he carried the money back to her and claims that she then gave it to him as a birthday gift to buy a Ford machine.

With reference to the bonds in question, the letter of the defendant written to the plaintiff, on December 11, 1916, contains pertinent and cogent evidence that he did not consider that he was the owner. He speaks of the bond as being "all she has and she will probably need it," and says:

"I am doing the best I can to keep her in funds without touching this bond. The bond pays five per cent., or $50 a year. That is her entire income as far as her money is concerned."

Continuing, he says:

"If she continues to demand money at the rate she has been asking for it, I will have to sell her bond and give her what she wants. If I do this, her income of $50 a year will be gone and she will have what she wants as long as it will last."

Further along, speaking of placing her in a home, he says:

"I am going to try to keep what she has left together so that she can be properly taken care of when that time comes."

In this letter there is no suggestion that he is the owner of the bonds, or that the decedent had given or attempted to give them to him, but throughout the expressions are clear that they belong to her.

The defendant further offered in evidence a letter written by the plaintiff to him, in which she states a conversation had with the decedent, in which the decedent stated: "I know he (defendant) will take care of what is mine." The defendant undertook to explain his testimony concerning the transfer and sale of the stock, the handling of the check and its proceeds, by saying that it was a whim of the decedent.

The testimony showed that the deceased was a maiden lady past seventy years of age; that prior to the alleged delivery of the safety deposit box keys to the defendant, that defendant's brother, Rev. Cain, had joint control of her deposit box, which was known to the defendant.

Taking into consideration all the evidence in the case, the relations of the parties, their dealings with one another and with the property in question, the court is of opinion that the evidence fails to sustain the claim that there was a gift of the property to the defendant by his aunt.

Was there a contract between the parties, upon which the defendant has a right to claim compensation for services rendered?

The amended answer sets forth that the decedent had lived many years in the home of the defendant's parents, as a member of the family, and without paying for the same. Just prior to the time the defendant took her home, in April, 1916, she had been living with strangers; became ill, and the defendant, learning of this condition, procured her removal to a hospital, where she was for some two weeks and then went to his home.

It is difficult to understand the statements of the amended answer concerning the former relations between the decedent and the family of the defendant, and the reasons for inserting those allegations in the amended answer, unless they are read

in connection with that part of the defendant's original answer which was eliminated from the amended answer but offered as an admission. That language is as follows:

"This defendant gave the attention and care to his said aunt for the sake of his mother, with whom his said aunt lived as aforesaid for twenty-five years or more, and his aunt made the gift to him as aforesaid not to compensate him in any way for what he and his wife had done prior to the gift or might do thereafter, but solely as a token of appreciation, knowing that this defendant and his family had always taken excellent care of her and always would continue to do the same."

The defendant and his wife testified that they, their children and the decedent lived together as a family, and that there was no agreement or understanding that there should be any compensation for any services that might be rendered to her.

In the letter of December 11, 1916, the defendant said: "She (decedent) has had absolutely no expense to pay of any kind."

The court is of the opinion, from the evidence, that when the defendant took the deceased to his home, in April, 1916, he had no other thought or intention than to render to his mother's sister the same kindly services which she had received during the life of the parents of the defendant, and that he was not actuated by any motives of gain and that there was no thought or intention on his part or on the part of the decedent to give him her property. It was a kindly act done from the purest of intentions, and the present claim, in the opinion of the court, is an afterthought, asserted after her death, probably because he felt that his family was more entitled to the property of the decedent than were her Pennsylvania relatives.

The law is well settled in this state as to a right to recover for services rendered to one member of a family by another:

"In an action to recover compensation for services, when it appears that the plaintiff was a member of the family of the person for whom the services were rendered, no obligation to pay for the services will be implied; and the plaintiff can not recover in such case unless it be established that there was an express contract upon the one side to perform the services for

compensation, and upon the other side to accept the services and pay for them.'' *Hinkle et al, Exrs.* v. *Sage,* 67 Ohio St., 256.

A case similar to the one last referred to is *Merrick* v. *Ditzler,* 91 Ohio St., 256, in which the same conclusion was reached.

The facts of these cases are not exactly the same as in the case at bar, but the principle is the same, and in the face of the statement of the defendant in his original answer that the gift to him was not to compensate him in any way, but solely as a token of appreciation, knowing that he and his family had always taken excellent care of her and always would continue to do the same, there is no room for the claim that there was a contract.

The court is constrained to find for the plaintiff, and the question now for consideration is as to the amount which is to be allowed to the defendant under the testimony.

The evidence showed that the total amount received as the proceeds of the sale of the stock and bonds was $1,189.17. The items referred to in the letter of December 11, 1916, by the defendant, aggregate $109.80. The funeral expenses paid by the defendant are admitted to be $234.75. Other small items are agreed to, aggregating $65.50. Making the total of expenditures to or for the use of the decedent, $410.05.

It should be remembered that besides these items, the defendant testified that he had made small payments to the deceased while she lived with him, of which he kept no account, and which he could not state with accuracy, but his impression was that they amounted to $75 to $100 and, when pressed for his best judgment as to the amount, stated $100. In the letter of December 11, 1916, referred to, he enumerated the items making the $109.80, but made no claim that he had expended any other money.

Can the court allow a claim for $100, or for any other amount, which is not proven, but which is, in effect, no more than a guess? Of course, absolute accuracy is not required, but something must be given upon which the court can form its judgment.

As stated in the case of *Oglesby, Exr.* v. *Thompson,* 59 Ohio St., 60, 63:

''Disputed facts, in civil suits, are determined upon reasonable probabilities—a mere preponderance of evidence is sufficient to determine the affirmative of an issue. The cases referred to, however, afford no authority for saying, that the court may speculate as to the state of accounts, or allow a recovery for an item without any proof as to the state of the accounts as between the partners. In *Slater, Myers & Co.* v. *Arnett, supra,* the syllabus is as follows: 'Where suit in equity is instituted to settle the accounts of a dissolved firm, one of the members being dead, and the report of the master to whom the accounts have been referred, shows that, after diligent search, he has been unable to discover and report any evidence whatever to base a statement of the true condition of affairs between the members of the late firm and of its assets, etc., the court, not being able to proceed to judgment upon suppositions and presumptions without evidence, can do no better than to withhold its hand, and to leave the parties to stand where they have placed themselves before the suit was brought.' ''

In the opinion of this court, this item of $100 has not been proven and can not be allowed.

The defendant will be charged with $1,189.17, and credited with $410.05, and judgment given against him for the balance—$779.12.